UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
JAMES DOLAN, On Behalf of Himself and          :     Civil Action No. $04 \ CV \ 8564$
All Others Similarly Situated,                 :
                                               :     CLASS ACTION
                        Plaintiff,             :
                                               :     COMPLAINT FOR VIOLATION OF THE
        vs.                                    :     FEDERAL SECURITIES LAWS
                                               :
AXIS CAPITAL HOLDINGS LTD.,                     :
MICHAEL A. BUTT and JOHN R.                     :
CHARMAN,                                        :
                                               :
                        Defendants.            :
                                               :     DEMAND FOR JURY TRIAL
———————————————————— x

- 1 -

## INTRODUCTION

1.      This is a securities fraud class action on behalf of persons who purchased the publicly

traded securities of AXIS Capital Holdings Ltd. ("AXIS" or the "Company") between August 6,

2003 and October 14, 2004 (the "Class Period"), against AXIS and its top officers, for violations of

the federal securities laws arising out of defendants' dissemination of false and misleading

statements concerning the Company's results and operations.

2.      AXIS is a holding company that through its operating subsidiaries provides a range of

insurance and reinsurance products on a worldwide basis.

3.      On October 14, 2004, *AFX International Focus* issued an article entitled "Spitzer

attacks insurance industry." The article stated in part:

> In his latest move in a high profile campaign against corporate wrongdoing, Eliot
> Spitzer charged several of the nation's largest insurance companies and the largest
> broker with bid rigging and pay-offs that the New York Attorney General says
> violate fraud and competition laws.
>
>      Spitzer unveiled a law suit Thursday against the world's largest insurance
> broker Marsh & McLennan for a common industry practice known as "contingent
> commissions."
>
>      Contingent commissions are paid by insurance companies to reward brokers
> for sending business their way.  Critics claim the payments encourage brokers to sell
> policies from those insurance companies offering the highest commissions, rather
> than the ones most suited to their customers.
>
>      Two executives from American International Group have pleaded guilty to
> charges related to the payments, Spitzer said during a televised press conference.
>
>      "The prevailing thought within the insurance community was that this
> investigation would result in minor disclosure changes or a slap on the wrist," said
> Adam Klauber, an analyst at Cochran, Caronia & Co.  "The fact that there are
> criminal charges suggests that Spitzer thinks parts of this business are really wrong
> and need changing."

4.      Upon the revelation of these illegal acts, the Company's shares fell to $23.36 from $25.89, a drop of 10%.

5.      During the Class Period defendants disseminated materially false and misleading statements concerning the Company's results and operations. The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)      That the Company was paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements";

(b)      That by concealing these "contingent commissions" and such "contingent commission agreements," the defendants violated applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens – if not hundreds – of millions of dollars; and

(c)      That as a result of (a)-(b) above, as more fully described in ¶¶26-30, the Company's prior reported revenue and income was grossly overstated.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

7.      Venue is proper here pursuant to §27 of the 1934 Act. Acts and transactions giving rise to the violations of law complained of herein occurred here. AXIS Reinsurance is incorporated in this state and conducts business here.

## THE PARTIES

8.      Plaintiff James Dolan purchased AXIS securities as detailed in the attached Certification and was damaged thereby.

- 3 -

9.      Defendant AXIS is a holding company that through its operating subsidiaries provides a range of insurance and reinsurance products on a worldwide basis.  During the Class Period, AXIS had approximately 155 million shares of common stock outstanding, which shares traded in an efficient market on New York Stock Exchange.

10.     Defendant Michael A. Butt ("Butt") is Chairman of the Board of the Company.

11.     Defendant John R. Charman ("Charman") is Chief Executive Officer, President and a director of the Company.

12.     Defendants are liable for the false statements pleaded herein, as those statements are each "group-published" information for which they are responsible.  The defendants named in ¶¶10-11 (the "Individual Defendants"), by reason of their stock ownership and positions with and relations to AXIS were controlling persons of AXIS.  AXIS in turn controlled the Individual Defendants.  The Individual Defendants and AXIS are liable under §20(a) of the 1934 Act.

## BACKGROUND

13.     AXIS is a holding company that through its operating subsidiaries provides a range of insurance and reinsurance products on a worldwide basis.  Through its subsidiaries, the Company provides investment products and life and property and casualty insurance to both individual and business customers in the United States and internationally.  Defendants sought to use its relationship with key insurance brokers to inflate the Company's revenues and EPS.

14.     There are basically three types of entities in the insurance market.  First, there are clients: companies and individuals seeking to purchase insurance for their businesses, employees or themselves.  Second, there are brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage.  Brokers represent the client, obtain price quotes, present the quotes to the client, and make recommendations to the client that include factors other than price, such as differences in coverage,

- 4 -

an insurance company's financial security, or an insurance company's reputation for service or claims payment. Third, there are insurance companies. They submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

15. In this structure, the client makes two types of payments: (1) it pays its broker an advisory fee or a commission for locating the best insurer, and (2) it pays the chosen insurance company premiums for the coverage itself. When the client pays a commission this is usually accomplished in one check to the broker, with the broker deducting the commission and forwarding the premium to the insurance company. Sometimes clients – particularly large commercial clients – break out the broker's fee and pay it directly to the broker.

16. In addition to the first commission payment described above, brokers sometimes receive another kind of payment, as well, but not one from the clients. These are called contingent commissions and come from insurance companies pursuant to arrangements generally known as contingent commission agreements. The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (1) how much business the broker's clients place with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and (3) the profitability of the business placed by the broker.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

17. On August 6, 2003, the Company issued a press release entitled "Axis Capital Reports Net Income of $117.8 Million for Second Quarter 2003." The press release stated in part:

> AXIS Capital Holdings Limited ("AXIS Capital") today reported net income for the quarter of $117.8 million, or $0.81 per diluted share, compared to $30.0 million, or $0.22 per diluted share, for the second quarter ended June 30, 2002, an increase of $87.8 million, or $0.59 per diluted share. Net income for the six months ended June 30, 2003 rose 264% to $224.9 million, or $1.55 per diluted share, from $61.7 million, or $0.46 per diluted share, for the corresponding period in 2002.

Net income excluding net realized gains and losses on investments, net of tax for the second quarter of 2003 was $102.3 million, or $0.70 per diluted share, compared with $21.3 million, or $0.16 per diluted share, for the quarter ended June 30, 2002. Net income excluding net realized gains and losses on investments, net of tax for the six months ended June 30, 2003 was $198.4 million, or $1.36 per diluted share, compared with $52.3 million, or $0.39 per diluted share, for the six months, ended June 30, 2002. Net income excluding net realized gains and losses on investments, net of tax is a non-GAAP financial measure. A reconciliation of this measure to net income is presented at the end of this release.

Shareholders' equity has grown to $2.2 billion as at June 30, 2003. Diluted book value per share was $15.44, an increase of $1.48 or 10.6% from December 31, 2002. Diluted book value per share is a non-GAAP financial measure. A reconciliation of this measure to shareholders' equity is presented at the end of this release.

John Charman, President and CEO, commented "We are delighted to have produced such a strong set of financial results for our first reporting period as a public company. These results clearly demonstrate the differentiating AXIS franchise that has been built over the last eighteen months. All four of our underwriting segments are now fully operational, each has top quality ratings, excellent staff and well capitalized platforms from which we can not only sustain our profitability but, more importantly, from which we can generate future growth."

Gross premiums written for the second quarter of 2003 were $551.5 million compared to $260.7 million for the second quarter 2002. Of these premiums written: $207.7 million were derived from global insurance compared to $163.5 million in the corresponding quarter of 2002; $120.1 million from global reinsurance compared to $97.2 million in the corresponding quarter of 2002; $171.1 million from U.S. insurance; and $52.6 million from U.S. reinsurance. The latter two segments began underwriting at the start of 2003; therefore, there are no comparatives for the periods in 2002. For the quarter ended June 30, 2003 compared to the quarter ended June 30, 2002, net premiums written rose to $449.8 million from $234.0 million and net premiums earned increased to $335.6 million from $94.5 million.

18.    On November 5, 2003, the Company issued a press release entitled "Axis Capital

Reports Net Income of $147.0 Million for Third Quarter 2003." The press release stated in part:

AXIS Capital Holdings Limited ("AXIS Capital") today reported net income for the quarter of $147.0 million, or $0.90 per diluted share, compared to $92.1 million, or $0.68 per diluted share, for the third quarter ended September 30, 2002, an increase of $54.9 million, or $0.22 per diluted share. Net income for the nine months ended September 30, 2003 rose 142% to $371.9 million, or $2.46 per diluted share, from $153.8 million, or $1.13 per diluted share, for the corresponding period in 2002.

- 6 -

Net income excluding net realized gains and losses on investments, net of tax for the third quarter of 2003 was $152.6 million, or $0.93 per diluted share, compared with $85.3 million, or $0.63 per diluted share, for the quarter ended September 30, 2002.   Net income excluding net realized gains and losses on investments, net of tax for the nine months ended September 30, 2003 was $351.0 million, or $2.32 per diluted share, compared with $137.6 million, or $1.01 per, diluted share, for the nine months ended September 30, 2002. Net income excluding net realized gains and losses on investments, net of tax is a non-GAAP financial measure.   A reconciliation of this measure to net income is presented at the end of this release.

Shareholders' equity has grown to approximately $2.7 billion at September 30, 2003.   Diluted book value per share was $16.72, an increase of $2.76, or 20%, from December 31, 2002.   Shareholders' equity includes the net proceeds received from the Company's initial public offering completed in July.   Diluted book value per share is a non-GAAP financial measure.   A reconciliation of this measure to shareholders' equity is presented at the end of this release.

*John Charman, President and CEO, commented, "We are delighted to show continuing significant high quality premium growth in all four of our underwriting segments despite the third quarter being a traditionally slow production period for many of our business lines.  As the irreversible flight of quality to quality continues unabated, AXIS is appropriately recognized across all our business lines as security that is safe, capable, consistent and highly service-oriented.  Hence, our global AXIS Capital franchise has been able to produce for our shareholders strong, real net income for the quarter."*

Mr. Charman added, "We will commence expensing stock options under the transitional provisions of FAS 148 in the fourth quarter of 2003.   This is consistent with our actions that have put us at the forefront of direct, effective corporate governance and transparent financial reporting since our inception."

Gross premiums written for the third quarter of 2003 were $633.9 million compared to $252.3 million for the third quarter 2002.   Of these premiums written: $249.3 million were derived from global insurance compared to $179.1 million in the corresponding quarter of 2002; $114.6 million from global reinsurance compared to $73.2 million in the corresponding quarter of 2002; $188.0 million from U.S. insurance; and $82.0 million from U.S. reinsurance.   The latter two segments began underwriting at the start of 2003; therefore, there are no comparatives for the periods in 2002.   For the quarter ended September 30, 2003 compared to the quarter ended September 30, 2002, net premiums written rose to $534.4 million from $200.0 million and net premiums earned increased to $397.5 million from $167.7 million.

19.     On February 11, 2004, the Company issued a press release entitled "Axis Capital's Net Income Doubles to $532.3 Million for 2003."   The press release stated in part:

AXIS Capital Holdings Limited ("AXIS Capital") today reported a 100% increase in net income for the year ended December 31, 2003 of $532.3 million, or $3.42 per diluted share, compared to $265.1 million, or $1.91 per diluted share, for the year ended December 31, 2002, an increase of $267.2 million, or $1.51 per diluted share.

Net income for the quarter ended December 31, 2003 rose 44.2% to $160.5 million, or $0.97 per diluted share, from $111.3 million, or $0.80 per diluted share, for the fourth quarter ended December 31, 2002.

Net income excluding net realized gains and losses on investments, net of tax for the year ended December 31, 2003 was $509.2 million, or $3.28 per diluted share, compared with $239.2 million, or $1.72 per diluted share, for the year ended December 31, 2002.

Net income excluding net realized gains and losses on investments, net of tax for the fourth quarter of 2003 was $158.4 million, or $0.96 per diluted share, compared with $101.6 million, or $0.73 per diluted share, for the quarter ended December 31, 2002.

Net income excluding net realized gains and losses on investments, net of tax is a non-GAAP financial measure. A reconciliation of this measure to net income is presented at the end of this release.

Shareholders' equity was in excess of $2.8 billion at December 31, 2003. This includes the net proceeds of $316.0 million received from the Company's initial public offering completed in July 2003. Diluted book value per share at December 31, 2003 was $17.48, compared to $13.96 at December 31, 2002. Diluted book value per share is a non-GAAP financial measure. A reconciliation of this measure to book value per share is presented at the end of this release.

20.    On May 3, 2004, the Company issued a press release entitled "AXIS Capital Reports

Net Income of $166.8 Million for First Quarter 2004." The press release stated in part:

AXIS Capital Holdings Limited ("AXIS Capital") today reported a 56% increase in net income for the quarter ended March 31, 2004 to $166.8 million, or $1.00 per diluted share, from $107.1 million, or $0.75 per diluted share, for the quarter ended March 31, 2003. This was generated by increased underwriting profits and investment income. Annualized return on shareholders' equity was 22.9% for the quarter ended March 31, 2004 compared to 21.2% for the quarter ended March 31, 2003.

Net income excluding net realized gains and losses on investments, net of tax, for the quarter ended March 31, 2004 was $157.6 million, or $0.94 per diluted share, compared with $96.0 million, or $0.67 per diluted share, for the quarter ended March 31, 2003. Net income excluding net realized gains and losses on investments, net of

tax, is a non-GAAP financial measure. A reconciliation of this measure to net income is presented at the end of this release.

> *John Charman, President and CEO, commented: "This first quarter of 2004 saw all four of our underwriting segments fully operational for the first time. Our diversified, global AXIS franchise was able to participate strongly in the important renewal season and all segments reported substantial growth ranging from 23% to 170%. This geographic and product diversified group of specialty businesses, trading daily as a highly efficient and focused, integrated underwriting machine, has generated an annualized return on average equity of 22.9%." Mr. Charman continued, "Our diversity of operations, our strong balance sheet, our highly skilled and well regarded underwriting professionals continue to attract quality business and drive long-term real value for our shareholders."*

Gross premiums written for the quarter ended March 31, 2004 were $1,044.1 million compared to $608.6 million for the quarter ended March 31, 2003, an increase of 72%. Of these premiums written: $300.4 million were derived from global insurance compared to $243.6 million in the corresponding quarter of 2003, an increase of 23%; $429.1 million from global reinsurance compared to $211.5 million in the corresponding quarter of 2003, an increase of 103%; $148.3 million from U.S. insurance compared to $91.9 million in the corresponding quarter of 2003, an increase of 61%; and $166.3 million from U.S. reinsurance compared to $61.6 million the corresponding quarter of 2003, an increase of 170%. The increase in our global reinsurance gross premiums written was largely driven by our strategic expansion into continental Europe. The increase in our U.S. insurance and reinsurance gross premiums written was largely driven by greater market penetration and our ability to participate fully in the first quarter's important renewal season.

For the quarter ended March 31, 2004 compared to the quarter ended March 31, 2003, ceded premiums increased to $144.9 million from $68.4 million and our net premiums written rose to $899.2 million from $540.1 million. Net premiums earned increased to $471.2 million from $302.4 million. The increase reflects the increase in our gross premiums written over the last twelve months.

For the quarter ended March 31, 2004, net investment income was $31.3 million and realized gains were $10.1 million, compared with $11.4 million in net investment income and $11.2 million in realized gains for the quarter ended March 31, 2003. The increase in net investment income was due to increased invested assets on which we obtained improved investment yields. Cash flow generated from operations was $365.5 million compared with $264.4 million for the quarter ended March 31, 2004.

21. On August 4, 2004, the Company issued a press release entitled "AXIS Capital Reports Net Income of $140.9 Million for Second Quarter 2004." The press release stated in part:

AXIS Capital Holdings Limited ("AXIS Capital") today reported net income for the second quarter of 2004 of $140.9 million, or $0.84 per diluted share, compared to $117.8 million, or $0.81 per diluted share, for the second quarter ended June 30, 2003, an increase of $23.1 million, or $0.03 per diluted share. Net income for the six months ended June 30, 2004 rose 37% to $307.6 million, or $1.84 per diluted share, from $224.9 million, or $1.55 per diluted share, for the corresponding period in 2003.

Net income excluding net realized gains and losses on investments, net of tax for the second quarter of 2004 was $144.7 million, or $0.87 per diluted share, compared with $102.4 million, or $0.70 per diluted share, for the second quarter of 2003. Net income excluding net realized gains and losses on investments, net of tax for the six months ended June 30, 2004 was $302.3 million, or $1.81 per diluted share, compared with $198.4 million, or $1.36 per diluted share, for the six months ended June 30, 2003. Net income excluding net realized gains and losses on investments, net of tax is a non-GAAP financial measure. A reconciliation of this measure to net income is presented at the end of this release.

*John Charman, President and CEO, commented: "Our results across all segments were once again very strong in the quarter, reflecting our continuing penetration of our targeted markets coupled with our low loss activity. While the market continues to struggle against the senseless price cutting practiced by a limited number of major carriers, we remain optimistic with respect to the opportunities afforded to an entrepreneurial, diverse and financially strong carrier like AXIS where risk selection remains paramount."*

Gross premiums written for the quarter ended June 30, 2004 were $629.3 million compared to $551.5 million for the quarter ended June 30, 2003, an increase of 14%. Of these premiums written: $216.2 million were derived from global insurance compared to $207.7 million in the corresponding quarter of 2003, an increase of 4%; $129.9 million from global reinsurance compared to $120.1 million in the corresponding quarter of 2003, an increase of 8%; $219.9 million from U.S. insurance compared to $171.1 million in the corresponding quarter of 2003, an increase of 29%; and $63.3 million from U.S. reinsurance compared to $52.6 million in the corresponding quarter of 2003, an increase of 21%. The increase in our U.S. insurance and U.S. reinsurance gross premiums written was largely driven by greater market penetration.

For the quarter ended June 30, 2004 compared to the quarter ended June 30, 2003, ceded premiums increased to $141.4 million from $101.6 million and our net premiums written rose to $487.9 million from $449.8 million. Net premiums earned increased to $486.4 million from $335.6 million. The increase in net premiums earned reflects the increase in our gross premiums written over the last twelve months.

For the quarter ended June 30, 2004, net investment income was $33.3 million and realized losses were $4.4 million, compared with $15.9 million in net investment income and $15.7 million in realized gains for the quarter ended June 30, 2003. The

increase in net investment income was due to increased invested assets on which we obtained improved investment yields. Cash flow generated from operations for the quarter ended June 30, 2004 was $419.0 million compared with $345.9 million for the quarter ended June 30, 2003.

22.     On October 11, 2004, the Company issued a press release entitled "AXIS Capital Reports Total Estimated Impact of Hurricanes for the Third Quarter." The press release stated in part:

> AXIS Capital Holdings Limited ("AXIS Capital") today reported that the total estimated net after-tax impact relating to its exposure to Hurricanes Charley, Frances, Ivan and Jeanne during the third quarter is expected to be between $190 - $210 million. This estimate is derived from the output of industry models, a review of in-force contracts and preliminary indications from clients. Actual losses from these hurricanes may vary materially from estimated losses.
>
> This estimate encompasses exposures from each of AXIS Capital's four segments and includes AXIS Capital's previously announced estimate for Hurricane Charley of $60 - $80 million.

23.     On October 14, 2004, *AFX International Focus* issued an article entitled "Spitzer attacks insurance industry." The article stated in part:

> In his latest move in a high profile campaign against corporate wrongdoing, Eliot Spitzer charged several of the nation's largest insurance companies and the largest broker with bid rigging and pay-offs that the New York Attorney General says violate fraud and competition laws.
>
> *          *          *
>
> Contingent commissions are paid by insurance companies to reward brokers for sending business their way. Critics claim the payments encourage brokers to sell policies from those insurance companies offering the highest commissions, rather than the ones most suited to their customers.
>
> *          *          *
>
> "The prevailing thought within the insurance community was that this investigation would result in minor disclosure changes or a slap on the wrist," said Adam Klauber, an analyst at Cochran, Caronia & Co. "The fact that there are criminal charges suggests that Spitzer thinks parts of this business are really wrong and need changing."

24.    Upon the revelations of these illegal acts, the Company's shares fell to $23.36 from $25.89, a drop of 10%.

25.    The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    That the Company was paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements";

(b)    That by concealing these "contingent commissions" and such " contingent commission agreements," the defendants violated applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens – if not hundreds – of millions of dollars; and

(c)    That as a result of (a)-(b) above, as more fully described in ¶¶26-30, the Company's prior reported revenue and income was grossly overstated.

## MISLEADING FINANCIAL STATEMENTS

26.    In order to overstate its earnings during the Class Period, AXIS violated Generally Accepted Accounting Principles ("GAAP") and SEC rules by failing to properly report and disclose the illegal nature of its revenue during the Class Period.

27.    These financial statements and the statements about them were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for and disclosure about its revenues, in violation of GAAP and SEC rules.  AXIS manipulated financial statements by allowing the Company to generate fees which it was not entitled to, which revenues may be forfeited (via fines, judgments and costs associated therewith) and which artificially inflated AXIS's revenue and income.

28.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

29.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers

- 13 -

securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

      (e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

      (f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

      (g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

      (h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

      30.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities

analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DEFENDANTS' SCIENTER

31.     Defendants are AXIS's top officers and directors.  Each of the Individual Defendants, by virtue of their high-level positions with AXIS, directly participated in the management of AXIS, was directly involved in the day-to-day operations of AXIS at the highest levels and was privy to confidential proprietary information concerning AXIS and its business, operations, products, growth, financial statements and financial condition and was aware of or deliberately disregarded that the false and misleading statements were being made by and regarding the Company.  Because of their managerial positions with AXIS, each of the Individual Defendants had access to the adverse undisclosed information about AXIS's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

32.     Defendants were personally familiar with the quality of the Company's revenues/income because they monitored AXIS's revenue, closely monitoring the performance of AXIS's operations via reports from AXIS's Finance Department, which were generated and provided to the Individual Defendants on a regular basis.  The reports summarized the sales, amount billed, credit terms and product type.  As a result of their monitoring, defendants were aware that AXIS would be unable to meet its projected results, unless they continued to engage in their illegal scheme.  Defendants were also or should have been keenly aware that their "record" results were actually the result of illegal "contingent agreements."

## CLASS ACTION ALLEGATIONS

33.     This is a class action on behalf of purchasers of AXIS publicly traded securities during the Class Period, excluding defendants (the "Class").  Excluded from the Class are officers

and directors of the Company, as well as their families and the families of the defendants. Class members are so numerous that joinder of them is impracticable.

34.     Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated the prices of AXIS's publicly traded securities and the extent of and appropriate measure of damages.

35.     Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### FIRST CLAIM FOR RELIEF

#### For Violation of §10(b) of the 1934 Act and Rule 10b-5
#### Against All Defendants

36.     Plaintiff incorporates by reference ¶¶1-35 herein.

37.     Defendants violated §10(b) and Rule 10b-5 by:

    (a)     Employing devices, schemes and artifices to defraud;

    (b)     Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (c)     Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of AXIS publicly traded securities.

38.     Class members were damaged as they paid artificially inflated prices for AXIS's publicly traded securities in reliance on the integrity of the market.

## SECOND CLAIM FOR RELIEF

### For Violations of §20(a) of the 1934 Act
### Against All Defendants

39.     Plaintiff incorporates by reference ¶¶1-38 herein.

40.     The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the 1934 Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their stock ownership, high-level positions, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

41.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  AXIS controlled the Individual Defendants and all of its employees.

42.     By reason of such wrongful conduct, defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding plaintiff and other members of the Class damages together with interest thereon;

C.     Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.     Awarding plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

<div align="center">

**JURY DEMAND**

</div>

Plaintiff demands a trial by jury.

DATED: October 28, 2004                    LERACH COUGHLIN STOIA GELLER
                                                     RUDMAN & ROBBINS LLP
                                           SAMUEL H. RUDMAN (SR-7957)
                                           DAVID A. ROSENFELD (DR-7564)


                                                     SAMUEL H. RUDMAN

                                           200 Broadhollow Road, Suite 406
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)

                                           LERACH COUGHLIN STOIA GELLER
                                                     RUDMAN & ROBBINS LLP
                                           WILLIAM S. LERACH
                                           DARREN J. ROBBINS
                                           401 B Street, Suite 1700
                                           San Diego, CA  92101
                                           Telephone:  619/231-1058
                                           619/231-7423 (fax)

                                           Attorneys for Plaintiff

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
197 South Federal Highway, Suite 200
Boca Raton, FL 33432
(561) 750-3000
(561) 750-3364 Facsimile

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

I, James Dalom ("Plaintiff"), declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1. Plaintiff has reviewed the AXIS CAPITAL HLDGS. complaint and authorized its filing.

2. Plaintiff did not purchase any common stock/securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate any private action under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4. The following includes all of Plaintiff's transactions during the Class Period specified in the complaint for the common stock/securities that are the subject of this action:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| AXIS CAPITAL HLDGS | Purchase | 175 | 5-7-04 | 27.80 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Please list additional transactions on a separate sheet if necessary.

5. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below:
Allied Waste, Infineon [illegible]

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27 day of OCT, 2004.

James Dalom
SIGNATURE