USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/17/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE AXIS CAPITAL HOLDINGS LTD.
SECURITIES LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

04 Civ. 8564 (RJH)

**MEMORANDUM
OPINION AND ORDER**

Plaintiffs bring this consolidated class action on behalf of shareholders of AXIS

Capital Holdings Limited ("AXIS"), alleging various securities law violations by AXIS,

three senior officers or directors of AXIS during the relevant period, John R. Charman,

Michael A. Butt, and Andrew Cook (collectively, the "Individual Defendants"), Morgan

Stanley & Co., Inc. and Citigroup Global Markets Inc. (collectively, the "Underwriter

Defendants"), and Marsh & McLennan Companies, Inc. ("Marsh"), a substantial indirect

shareholder of AXIS. Defendants have moved to dismiss the consolidated complaint (the

"Complaint") pursuant to Rules 12(b)(5), 12(b)(6), and 9(b) of the Federal Rules of Civil

Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L.

No. 104-67, 109 Stat. 737 (codified in part at 15 U.S.C. §§ 77z-1, 78u-4). For the

reasons set forth below, the motion is granted.

## BACKGROUND

### A.    The Parties and the Claims

Bermuda-based defendant AXIS, shares of which were first publicly offered in

July 2003, provides insurance and reinsurance through its wholly owned subsidiaries

AXIS U.S. Holdings (incorporated in Delaware in March 2002) and AXIS Specialty

Holdings Ireland Limited (incorporated in Ireland in January 2002). (Compl. ¶¶ 23–25.)

These two subsidiaries act as holding companies for a number of AXIS entities which are authorized to write insurance and reinsurance in a variety of territories in the United States and Europe. (*Id.* ¶¶ 23–25.) The Underwriter Defendants are New York–based national investment banking firms which acted as co-lead underwriters on AXIS's Secondary Public Offering of 23 million shares at \$27.91 per share on or about April 15, 2004 (the "Secondary Offering"). (*Id.* ¶¶ 47–48.) Marsh is one of the world's largest insurance brokers providing clients with risk and brokerage services. A large portion of the insurance sold by AXIS was placed through Marsh acting as broker. Marsh, through its related entities, is also a significant shareholder in AXIS and sold a portion of those shares in the Secondary Offering. (*Id.* ¶¶ 250–52, 66.) The claims against Marsh in the Complaint arise out of its capacity as an AXIS shareholder and not with respect to its capacity as an insurance broker.

Count One of the Complaint asserts claims against AXIS and the Individual Defendants (the "AXIS Defendants") under Section 10(b) of the Exchange Act and Rule 10b-5. Count Two of the Complaint brings claims under Section 10(b) of the Exchange Act and Rule 10b-5(c) against defendant Marsh. Count Three brings claims against defendants Charman, Cook, and Marsh for violation of Section 20(a) of the Exchange Act. Count Four brings a claim under Section 20A of the Exchange Act against Marsh. Count Five brings claims under Section 11 of the Securities Act against the AXIS Defendants and the Underwriter Defendants. Count Six brings claims for violations of Section 12(a)(2) of the Securities Act against Marsh and the Underwriter Defendants. Finally, Count Seven brings claims for violation of Section 15 of the Securities Act against defendants Charman, Cook and Marsh.

## B.    The New York Attorney General Investigation

On October 14, 2004, the New York Attorney General, Eliot Spitzer, filed a civil complaint (Gentile Decl. Ex. 3 (the "AG Complaint")) against Marsh charging the insurance broker with violating state securities and antitrust laws (*id.*; Compl. ¶¶ 1–3). The AG Complaint was filed in the midst of Spitzer's wide-ranging investigation of certain brokering practices in the insurance industry, and named several major insurance companies—ACE, AIG, The Hartford, and Munich American Risk Partners—as alleged participants in the violations. Defendant AXIS was not named or referenced in the AG Complaint.

The AG Complaint challenges the manner in which Marsh used a type of commission agreement, called a "contingent commission agreement," pursuant to which insurance companies made payments directly to Marsh based on the amount of business that Marsh placed with the insurance company. The complaint charges that this resulted in the improper "steering" of business by Marsh to the insurance companies who paid the highest contingent commissions in contravention of Marsh's fiduciary duty to the insureds to locate the best and most economical coverage. (*See* AG Compl. ¶¶ 17–27.) According to the AG Complaint, Marsh implemented its steering scheme by (a) centralizing the negotiation of contingent commission agreements in a single business unit, (b) internally rating insurance companies based on how much they paid Marsh and (c) rewarding employees who moved business to insurance companies who had signed contingent commission agreements. (*Id.* ¶¶ 31–42.) As part of the steering scheme, Marsh and several prominent insurance companies—not including AXIS—were alleged to have engaged in bid rigging to insure that a favored insurance company's bid was accepted. (*Id* ¶¶ 43–66.) Marsh was also charged with securities fraud for making

3

misleading disclosures to its shareholders regarding contingent commission agreements.
(*Id.* ¶¶ 26–28.) It was not alleged that the existence these agreements were kept "secret"
from Marsh shareholders; rather it is alleged that Marsh's disclosures contained false and
misleading statements as to the "true nature" of the agreements. (*Id.*)

While the AG Complaint alleges that "[a] cast of the world's largest insurance
companies have participated in Marsh's steering scheme," (*id.* ¶ 43), it does not appear
that insurance regulators considered contingent commission agreements to be illegal in
themselves. The agreements have been publicly in use for many years; indeed, in 1998
the New York State Insurance Department issued a directive regarding their required
disclosure by brokers to insureds. *See* Disclosure of Brokers' Compensation, Circular
Letter 22 (Aug. 25, 1998), *available at* http://www.ins.state.ny.us/cl98_22.htm.
Similarly, after the AG Complaint was filed, the Superintendent of Insurance, Gregory V.
Serio, testified before the New York legislature that

> [c]urrent law, as the Attorney General and I have stated, does not
> prohibit contingent commission arrangements between insurers
> and brokers . . . . While [these arrangements] between insurers and
> brokers are lawful on their face, they have been used
> inappropriately (inadequate or vague disclosures [to insureds]) and
> sometimes illegally (bid rigging and steering).

(Statement of New York State Insurance Dep't before New York State Assembly
Standing Committee on Insurance (Jan. 7, 2005) ("N.Y.S. Insurance Dep't Statement"),
Dnistrian Decl. Ex. 4.)

On October 28, 2004, the first of the instant consolidated actions was filed, one of
several securities class actions filed against insurance brokers and insurance companies in

4

the days following the filing of the AG Complaint against Marsh.[1] On November 3, AXIS issued a press release that read in part, "Consistent with long-standing and wide-spread industry practice, we have entered into incentive commission agreements with brokers. As a result of this investigation, we have ceased entering into, and have suspended making payments under, incentive commission agreements . . . . [W]e do not believe we have engaged in the improper business practices that are the focus of the Attorney General of the State of New York's investigation." Press Release, AXIS Capital, AXIS Capital Reports Net Income of $6.3 million for Third Quarter 2004 (Nov. 3, 2004), *available at* http://www.axiscapital.com/axis-news/frmset-news-list.html.

## C.    Structure of the Industry

There are three primary players in the insurance market:  (1) customers or "insureds" who seek to purchase various types of casualty and liability insurance; (2) brokers who represent the insureds and provide advice on the scope of coverage required, and obtain and make recommendations about price quotes provided by insurance companies; and (3) there are insurance companies who submit bids and enter into contracts with the insureds.  (Compl. ¶ 14; AG Compl. ¶ 62); *see also In re Marsh &McLennan Cos., Inc. Secs. Litig.*, 04 Civ. 8144 (SWK), 2006 WL 2057194, at *11 (S.D.N.Y. July 20, 2006).[2]

Insureds make two types of payments on completed transactions.  They pay brokers a commission for locating the insurer who offers the product best suited (in terms

---

[1] The Stanford Law School Securities Class Action Clearinghouse, http://securities.stanford.edu, lists investigation-related actions against American International Group, Inc, MARSH, The Hartford, ACE Limited, MetLife, Inc., and Aon Corporation, all filed in October 2004.
[2] The court in *In re Marsh* identifies a fourth player, the risk manager, who advises insureds as to the type of coverage needed.  *In re Marsh*, 2006 WL 2057194, at *11.

of price and coverage) to the insureds' needs. And, of course, insureds pay premiums to the insurance companies as consideration for the coverage provided. (AG Compl. ¶ 16); *In re Marsh*, 2006 WL 2057194, at *11.

In addition to receiving commissions from their insureds, brokers frequently receive "contingent commissions" from insurance companies pursuant to agreements known as placement service agreements or market service agreements (hereinafter collectively "contingent commission agreements"). (Compl. ¶ 4; AG Compl. ¶ 16; N.Y.S. Insurance Dep't Statement, Dnistrian Decl. Ex. 4.); *see also In re Marsh*, 2006 WL 2057194, at *11. As might be expected, the "longstanding practice" of paying contingent commission (AG Compl. ¶ 4) is a matter of public record. Marsh, the largest broker in the U.S. market, has described contingent commission agreements in its SEC filings. (AG Compl. ¶ 26 (quoting Marsh's 1998 10-K)); *In re Marsh*, 2006 WL 2057194, at *20. Marsh has also publicly disclosed the method by which contingent commissions are calculated:

> Placement services revenue and contingent fees includes payments or allowances by insurance companies based upon such factors as the overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the loss performance to the insurer of that business.

(Marsh 1999 10-K at 4, Conn Decl. Ex. A; *see also* AG Compl. ¶ 16.)

Because brokers are the legal representative of, and have a fiduciary duty to their insureds, the receipt of contingent commissions creates a potential, if not actual conflict of interest. Consequently, the New York State Insurance Department issued guidelines directing the disclosure by brokers of contingent compensation arrangements to insureds "to enable insureds to understand the costs of the coverage and the motivation of their brokers in placing the business." *See* Circular Letter No. 22 (August 25, 1998), available

6

at http://www.ins.state.ny.us/C198_22.htm; *see also In re Marsh*, 2006 WL 2057194, at
*11.

## D. Plaintiff's Allegations

### 1. AXIS's Alleged Participation in an Anticompetitive Scheme

As a predicate for their securities fraud claim, plaintiffs allege that AXIS engaged
in illegal conduct, the *nondisclosure* of which rendered various statements made by the
company false and misleading. The alleged illegal conduct is summarily described as "a
scheme to manipulate the insurance market through improper and anticompetitive
agreements under which AXIS paid certain insurance brokers to steer business to AXIS
and away from AXIS' competitors." (Compl. ¶ 2). Plaintiffs characterize the use of
contingent commission agreements as a "hidden pay-to-play" scheme wherein secret
"kickbacks" are paid to brokers. (*Id.* ¶ 89.) It is impossible to tell from the complaint
whether plaintiffs allege that contingent commission agreements are illegal *per se*, or,
rather, that they were used illegally as part of an alleged scheme. It is also difficult to
discern from the complaint the legal theory upon which plaintiffs base their allegations of
illegal conduct. However, at argument on the pending motions, plaintiffs confirmed that
the theory underlying the complaint is that AXIS engaged in anticompetitive conduct
designed to squeeze other insurance companies out of the market. (May 16, 2006 Tr. 51,
69.) It is with respect to this alleged illegal conduct that the Court will analyze
defendants' alleged securities law violations.

### 2. The Alleged Securities Law Violations

Plaintiffs' securities law claims "boil down" to three items: (a) Axis did not
disclose that the company's financial results were reliant upon and unsustainable in the

absence of payment of contingent commissions to brokers; (b) statements made by AXIS about its competitive strengths and the competitive nature of the insurance industry were false because they failed to disclose the fact that AXIS was engaged in illegal anticompetitive arrangements; and (c) AXIS's disclosures of its acquisition costs, while accurate, were false and misleading because AXIS did not disclose that part of the costs included illegal incentive commissions paid to the brokers. (*See* May 16, 2006 Tr. 51–52; *see also, e.g.*, Compl. ¶¶ 89–91, 98–100, 112–15, 122–25, 131–33, 140–42.)

In support of their first claim, plaintiffs allege that two brokers who employed contingent commission agreements, Marsh and Aon, accounted for approximately 70% of the global insurance and reinsurance brokerage markets and accounted for 33.7% and 19.3%, respectively, of AXIS gross premiums in 2003. (Compl. ¶ 66.) Though unstated, the implication is that AXIS was dependent on the services of Marsh and Aon. Plaintiffs further allege that AXIS did not compete with other insurance companies for clients and instead paid improper incentive commissions. (*Id.* ¶ 90.) On this basis, plaintiffs allege that every periodic report of the company's financial results issued during the relevant period was false because AXIS did not disclose that the results would be "unsustainable" if the use of contingent commission agreements was discontinued. (*Id.* ¶¶ 2, 10, 89, 112, 122, 131, 140.)

With regard to plaintiffs' second claim, the complaint specifies a series of statements made by the AXIS Defendants during the Class Period that are alleged to have been materially misleading to investors, including the following:

> We've distinguished ourselves from the marketplace, not only with our team of proven market leaders, but also by the model that I referred to as our underwriting machine, our strong balance sheet, our pattern of controlled growth and our global diversity . . . . The AXIS franchise is defined by its financial strength, client service and capabilities to write

8

business across geographies and product lines . . . . AXIS is recognized by clients and intermediaries as a must-have market, and we continue to experience a transfer of business to us and away from weaker or less reliable carriers . . . . We expect to continue to grow through book building [and] the expansion of existing relationships.

(Aug. 7, 2003 analyst teleconference, spoken by defendant Charman, Compl. ¶ 85); "To achieve these results we have built on the strong and diversified leadership positions previously established throughout our global insurance and global reinsurance segments, and rapidly expanded our business model in the U.S. marketplace with the establishment and development of U.S. insurance and U.S. reinsurance segments" (Feb. 12, 2004 analyst teleconference, spoken by defendant Charman, Compl. ¶ 104); "[T]he insurance and reinsurance industry is highly competitive" (2003 10-K, Compl. ¶¶ 108, 113; *see also* Mar. 26, 2004 Secondary Offering Registration Statement, as amended on April 6, 2004, Compl. ¶ 119 (using same language)); "We believe our competitive strengths have enabled, and will continue to enable, us to capitalize on the significant dislocation in the insurance and reinsurance marketplace" (Mar. 26, 2004 Secondary Offering Registration Statement, as amended on April 6, 2004, Compl. ¶ 119); and attributing first quarter growth in 2004 to "our strong balance sheet in the ongoing flight to quality as it is skirted by exceptional professional underwriting talent and further differentiated by a superior service to our global clients" (May 4, 2004 analyst teleconference, spoken by defendant Charman, Compl. ¶ 127).

The Complaint alleges that statements such as the above, given as the "reasons behind AXIS' apparent success and future prospects" were materially false and misleading when made because "AXIS did not compete with other insurance companies for clients. Instead, the AXIS Defendants and Marsh were aware of and/or participated in the drafting of incentive commission agreements that provided for the payment of

9

improper incentive commissions to insurance brokers in a 'hidden pay-to-play scheme' [which squeezed out other insurance companies]." (*Id.* ¶¶ 99, 113, 123, 132, 141; *see also* May 16, 2006 Tr. 51.)

Plaintiffs' third claim is based on a single allegation, repeated with respect to each SEC filing made during the Class Period, that AXIS's statements as to its acquisition costs were materially false because the statements "failed to inform investors what acquisition costs included, and led investors to believe that acquisition costs were the costs of doing business rather than illicit incentive commission payments to brokers in exchange for steering business to AXIS and away from AXIS' competitors." (Compl. ¶ 91; *see also id.* ¶¶ 113, 123, 141.)

## DISCUSSION

### A.   Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), the court should grant such a remedy only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *King v. Simpson*, 189 F.3d 284, 286 (2d Cir. 1999); *Bernheim v. Litt*, 29 F.3d 218, 321 (2d Cir. 1996). Moreover, the court accepts as true "all well-pleaded factual allegations in the complaint and draw[s] all reasonable inferences in favor of the nonmoving party." *SEC v. Pimpco Advisors Fund Mgmt., LLC*, 341 F. Supp. 2d 454, 463 (S.D.N.Y. 2004) (citing *Secs. Investors Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir. 2000)). In addition to the allegations set forth therein, a complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have

10

been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989), *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991)). The Court may also, of course, consider matters of which judicial notice may be taken under Federal Rule of Evidence 201. *See Kramer*, 937 F.2d at 773.

While the rules of pleading in federal court usually require only "a short and plain statement" of the plaintiff's claim for relief, Fed. R. Civ. P. 8, averments of fraud must be "stated with particularity," Fed. R. Civ. P. 9(b). In the context of securities fraud complaints, the PSLRA has expanded on Rule 9(b)'s pleading requirements. Pub. L. No. 104-67, 109 Stat. 737, *see* 15 U.S.C. § 78u-4(b). "That statute insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

"The Second Circuit evaluates a securities complaint's compliance with Rule 9(b) and the PSLRA by means of a common formulation. 'A complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *In re Marsh*, 2006 WL 2057194, at *8 (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999)).

11

The requirements of Rule 9(b) not only give defendants adequate notice about the details of the fraud claim against them, but operate to "deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect professionals from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *In re Stac Elecs. Secs. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (internal quotation marks omitted). As the Second Circuit has noted, it "is a serious matter to charge a person with fraud and hence no one is permitted to do so unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir. 1982) (noting applicability of Rule 9(b) to Section 10(b) claims).

Additionally, the PSLRA imposes its own pleading standards on actions in "which the plaintiff alleges that the defendant [either] made an untrue statement of a material fact [or] omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading." 15 U.S.C. § 78u-4(b)(1) (2000). In such circumstances, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* Where "proof that the defendant acted with a particular state of mind" is at issue, the PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

12

**B. Section 10(b): Material Misstatements and Omissions**

To state a claim for securities fraud under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must allege that the defendant: "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re IBM Corp. Secs. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998) (citations omitted); *see also Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003). As discussed above, these allegations must be pled in the requisite detail.

At the pleading stage, a plaintiff will satisfy "the materiality requirement ... by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). While courts will not grant motions to dismiss pursuant to Rule 12(b)(6) on grounds of immateriality "unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance," materiality allegations in securities fraud complaints must nevertheless "comply with the particularity requirements of Fed. R. Civ. P. 9(b) and the PSLRA; the materiality of the alleged misstatements or omissions cannot be pled in a conclusory or general fashion." *In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 625–26 (S.D.N.Y. 2005).

In the present case, each of plaintiffs' nondisclosure claims are entirely dependent upon the predicate allegation that AXIS participated in an anticompetitive scheme to drive other insurance companies out of the market. *See* discussion *supra* (describing alleged scheme). If the complaint fails to allege facts which would establish such an

illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed. *See In re Yukos Oil Co. Secs. Litig.*, 2006 WL 800736, at *12 (S.D.N.Y. Mar. 30, 2006) (finding allegation that "tax strategy amounted to an illegal 'transfer pricing' scheme in violation of Article 40 of the Russian Federation Tax Code" not pled with sufficient particularity where the allegation that the transfer scheme violated Article 40 went unsupported by "sufficient facts demonstrating that [the] tax strategy [actually] violated Article 40"); *In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005) (finding that plaintiffs failed to allege with particularity that defendant corporation made material omissions in failing to disclose legal violations, when "[t]he charge that JPM Chase's officers violated Sections 18 U.S.C. § 1005, by receiving "kickbacks" in exchange for loans to Enron suffer[ed from a lack of] support in the factual allegations").

Plaintiffs here offer nothing more than conclusory allegations that an anticompetitive scheme existed. In this respect, the Complaint stands in stark contrast to the AG Complaint where the antitrust claim against Marsh was premised on specific allegations that Marsh and certain identified insurance companies engaged in bid rigging, a *per se* violation of the antitrust laws. (AG Compl. ¶¶ 17, 43–66.) Plaintiffs—to their credit as they apparently have no incriminating facts—do not allege that AXIS participated in any bid-rigging conspiracy or, for that matter, any form of customer or market allocation.

Plaintiffs do allege that AXIS engaged in the "steering" of business (Compl. ¶ 90), but there is no explication of how the steering occurred or in what manner this activity violated competition laws. By contrast, the AG Complaint makes very specific factual allegations as to the means by which Marsh allegedly steered its insureds,

14

including the internal ranking of insurance companies based on the amount of incentive commissions paid and the payment of compensation incentives to employees who increased the amount of insurance placed with companies who paid the highest incentive commissions. No such factual allegations regarding AXIS involvement in steering activities are found in plaintiffs' complaint. And even if they were, there are no allegations specifying how any steering activities would actually violate state or federal antitrust laws. While, as noted, contingent commission agreements raise the possibility of a breach of fiduciary duties by brokers (possibly aided and abetted by insurance companies), in the absence of allegations as to arrangements that operate to allocate customers or exclude other insurance companies from the marketplace, no antitrust violation is apparent. Plaintiffs at times appear to contend that contingent commission agreements themselves, "operate to drive other insurance companies out of the market." But plaintiffs make no allegations that AXIS and Marsh entered into any conspiracy whereby Marsh would decline to negotiate incentive agreements with other insurance companies on an equal basis. If other insurance companies were free to enter into contingent commission agreements with brokers (as plaintiffs implicitly concede), then in the absence of allegations of some other restraint of trade, no scheme to exclude other insurers from the market is properly pled. *See In re Ins. Brokerage Antitrust Litig.*, 04 Civ. 5184 (FSH), 04 Civ. 1079 (FSH), 2006 WL 2850607, at *13 (D.N.J. Sept. 15, 2006) (Slip Copy) (concluding that "[t]he existence of contingent commission agreements between the Broker Defendants and other insurers shows that the parties engaged in a business relationship; but it is not, without more, but is not, without more, an allegation that the Defendants conspired among each other[] in violation of the Sherman Act," in finding antitrust claims against brokers and insurers inadequately pled).

15

In reaching this conclusion, the Court need not assume that the use of contingent commissions was free of illegality. Indeed, if Marsh in fact made recommendations to insureds based on the amount of commissions it would receive and not on what was best for its insureds, it may well be that fiduciary duties have been breached. However, plaintiffs eschew such theories of illegality, presumably because it would undermine their second claim that AXIS misled its shareholders as to the competitive state of the insurance industry. Whatever the reason, plaintiffs' bald allegations of a scheme to drive other insurance companies from the market are far too conclusory to satisfy the requirements of Rule 9 and the PSLRA. This defect necessarily infects each of plaintiffs' claims. These claims are flawed for other reasons which will be discussed below.

1.      Claim 1: Duty to Disclose that Revenues were "Unsustainable"

Plaintiffs claim that AXIS's disclosure of net income, gross premiums and net premiums in its periodic requests (*see, e.g.*, Compl. ¶ 98), as well as in the Registration Statement (*id.* ¶ 119), were materially misleading.[3] Plaintiffs do not claim that the financial statements were inaccurate or violated GAAP. Rather they allege that the flow of AXIS's business, as received from brokers, was inherently precarious in that "financial results and the nature of its business operations were reliant upon and unsustainable at historical levels in the absence of its participation in a scheme to manipulate the insurance market through improper and illegal anticompetitive agreements. (*Id.* ¶ 2.)

Assuming, *arguendo*, that an anticompetitive scheme was adequately pled, defendants were under no duty to disclose the risk that contingent commission agreements might be discontinued. Indeed, whether such a duty existed was considered

---

[3] The Registration Statement included AXIS's consolidated financial statements for the years ended December 31, 2003 and 2002 and for the period from AXIS's inception through December 31, 2001. (Compl ¶ 72.)

and soundly rejected by Judge Kram in *In re Marsh*. 2006 WL 2057194, at *13 (holding that insurance broker and individuals defendants "can not be held liable for failing to make . . . speculative disclosures regarding the possibility that its contingent commission revenues may some day be discontinued . . . . Plaintiffs essentially allege that Defendants had a duty to disclose the existence of improper business practices prior to any indication that those practices were under scrutiny. Such a general duty to disclose corporate mismanagement or uncharged criminal conduct has been rejected."). Virtually the same claim was also dismissed in a securities fraud action brought against another insurance broker, Hilb Rogal & Hobbs ("HRH"). *See Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 586 (E.D. Va. 2006) ("The general allegation that the reporting of revenues [pursuant to contingent commission agreements] implicitly represented that such results would continue is insufficient ... [plaintiff] fails to plead that HRH had a duty to disclose that its revenues were unlikely to be sustained or might be discontinued.") Other decisions including *In re Par Pharmaceuticals*, on which plaintiffs heavily rely, are to the same effect. *In re Par Pharm., Inc. Secs. Litig.*, 733 F. Supp. 668, 678 (S.D.N.Y. 1990) (no generalized duty to disclose potential impact of end of a "bribery scheme" on a company, as "the company was not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the bribery scheme was discovered, disclosed or terminated . . . . Defendants cannot be held liable for failing to 'disclose' what would have been pure speculation."); *see also In re Citigroup, Inc. Secs. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004) ("Plaintiff's section 10(b) claim, insofar as it is premised on the assertion that Citigroup breached a duty to disclose that its revenues were 'unsustainable,' also fails to state a claim upon which relief can be granted . . . [the

17

suggestion] that Citigroup's reporting of revenue figures implicitly represented that such results would continue [triggered no duty to disclose].").

As a matter of law, no statements regarding AXIS's accurately reported revenue and income have been rendered materially misleading by failing to disclose that such income was "unsustainable."

## 2. Claim 2: Disclosure Regarding AXIS's "Competitive Strengths"

Plaintiffs contend that AXIS's statements as to its competitive strengths were rendered false and misleading by the failure to disclose the alleged anticompetitive scheme to drive other insurers from the market. While "the fact that a corporation's employees engaged in illegal conduct may well be material to the reasonable investor for several obvious reasons," the obligation to disclose uncharged illegal conduct will not "arise from the materiality of this information alone. Rather . . . a duty to disclose uncharged illegal conduct arises when it is necessary to disclose this conduct under the terms of a statute or regulation, or when it is necessary to disclose this conduct in order to prevent statements the corporation does make from misleading the public." *Menkes v. Stolt-Nielsen S.A.*, 03 Civ. 0409 (DJS), 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2005). Courts have noted that "once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading." *In re Par Pharm.*, 733 F. Supp. at 675; *see also Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 25–29 (1st Cir. 1987) (noting that, while information about bribery payment may have been material to investors, "[e]ven if information is material, there is no liability under Rule 10b-5 unless there was a duty to disclose it" and dismissing claim because "complaint does not allege

18

facts that, if proved, would establish Alpha had a duty to disclose the alleged illegal payments").

The Complaint sets forth two statements made by AXIS on the subject of competition. In the Registration Statement for the Secondary Offering, AXIS states: "We believe our competitive strengths have enabled, and will continue to enable, us to capitalize on the significant dislocation in the insurance and reinsurance marketplace." (Compl. ¶ 119.)) And in its 2003 10-K, AXIS states that "[t]he insurance and reinsurance industry is highly competitive." (*Id.* ¶¶ 108, 113.) In evaluating the adequacy of plaintiffs' allegation that these statements are misleading, the company's disclosures must be "read as a whole . . . . [T]he central inquiry to determine whether a [filing] is materially misleading is whether the defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities." *In re N2K, Inc. Secs. Litig.*, 82 F. Supp. 2d 204, 209 (S.D.N.Y. 2000) (examining liability under Section 11 of the Securities Act); *see also Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.").

As the *Menkes* court noted, "[c]ourts that have determined that corporations had a duty to disclose uncharged illegal conduct in order to prevent other statements from misleading the public have *required a connection* between the illegal conduct and the statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or bottom line." *Menkes*, 2005 WL

3050970, at *7 (emphasis added). The connection between the alleged inaccurate statement and the underlying conduct may not be too attenuated, and, again, must be pled with sufficient specificity.

In determining whether the omissions alleged in the Complaint regarding AXIS's alleged anticompetitive conduct is sufficiently connected to its existing disclosures so as to make those disclosures misleading, it is useful to consider the court's analysis of similar claims in *In re Marsh*, 2006 WL 2057194, a closely related case filed on behalf of Marsh shareholders on the heels of the AG Complaint. As noted, Judge Kram found that highly specific allegations of steering and bid rigging did not support a claim that Marsh misstated its earnings, or failed to disclose that "contingent commissions may someday be discontinued." *Id.* at *41. The court did find, however, that Marsh had made disclosures regarding the nature of services provided in exchange for contingent commissions and that these affirmative statements were rendered misleading by virtue of the bid rigging and steering alleged in the complaint. Here, of course, bid rigging is not alleged and steering is alleged in the most conclusory terms. Of more critical importance, plaintiffs point to no comparable description by AXIS of services provided or received for contingent commissions that was thereby rendered misleading. This is not in itself surprising as AXIS is not in the business of providing brokerage services. *In re Marsh*, then, provides little support for plaintiffs' allegation that AXIS, like Marsh, had a duty to disclose the "true nature" of contingent commission agreements.

A stronger argument for a claim of *nondisclosure* can be found in three "illegal conduct" cases upon which plaintiffs not surprisingly rely. *In re Sotheby's Holdings Inc.*, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000); *In re Par Pharm.*, 733 F. Supp. 668; *In re Providian Fin. Corp. Secs. Litig.*, 152 F. Supp. 2d 814 (E.D. Pa. 2001). In each of these

cases, however, the illegal conduct was specifically pled and there was a direct nexus to the defendant's existing disclosures which rendered those statements misleading. In *Sotheby's*, defendant and its major competitor, Christie's, engaged in a price-fixing conspiracy to set commission rates charged to buyers. During the period of the conspiracy, Sotheby's annual reports stated that there was "intense" competition with Christie's, and generally, that competition in the marketplace was "intense." In these circumstances, the court found that Sotheby's statements regarding competition gave rise to a duty to disclose a price-fixing agreement that had eliminated price competition in the marketplace, and had little difficulty concluding that the complaint alleged material omissions with sufficient particularity to withstand a motion to dismiss. *In re Sotheby's Holdings Inc.*, 2000 WL 1234601, at *4. By contrast, plaintiffs in the present case do not appear to allege that contingent commission agreements are themselves illegal restraints of trade, or if they do, plaintiffs make no specific factual allegations as to why this is so. Nor do plaintiffs allege what other acts underlie the alleged scheme to drive competitors out of the marketplace. *See* discussion *supra* (describing alleged scheme). Moreover, the statements AXIS did make, referencing its "competitive strengths" or stating that the insurance and reinsurance industries were "highly competitive" are far more innocuous than Sotheby's disclosure which were directly contradicted by specific allegations of a price-fixing conspiracy between companies that accounted for 95% of the market. *See In re Sotheby's Holdings Inc.*, 2000 WL 1234601, at *2. No similar facts are alleged in the Complaint.

Ultimately, plaintiffs are unable to allege in other than conclusory terms how AXIS's statements were rendered false because they are unable to allege how AXIS engaged in the alleged scheme to drive other insurance companies from the market.

21

Plaintiffs cannot parrot allegations made in the AG Complaint against Marsh (specific acts of steering) and other insurance companies (specific acts of bid rigging) to establish a factual predicate for AXIS's misuse of contingent commission agreements, and then allege that AXIS's statement as to its "competitive strengths" should be read as a misrepresentation of some unspecified anticompetitive conduct. Thus plaintiffs' reliance on *Sotheby's* is misplaced, as is its reliance on *In re Par Pharmaceuticals*, 733 F. Supp. at 677–78 ("[B]y extolling Par's ability to obtain FDA approvals, by comparing Par's success in this regard to other companies in the industry and to its own previous performance, and by projecting continued success in obtaining rapid approvals," defendants created a duty to disclose alleged bribery of Food and Drug Administration officials for the purpose of obtaining expedited approval of new drug applications, because "the statements conveyed to a reasonable investor the false impression that Par had a particular expertise in obtaining FDA approvals constituting a legitimate competitive advantage over other companies and that this advantageous expertise was responsible for its success in obtaining FDA approvals"), and *In re Providian*, 152 F. Supp. 2d at 823–24 (specific, detailed allegations of fraudulent practices that inflated defendant's revenue and rendered financial results inaccurate put into play defendants statement that its [artificial] results were the result of a "customer-focused approach.").[4]

---

[4] Relying on *In re Par Pharmaceuticals*, a district court recently declined to dismiss claims that an insurance company's illegal collusion with Marsh rendered its affirmative statements about revenue growth misleading. *In re St. Paul Travelers Secs. Litig. II*, 04 Civ. 4697 (JRT), 2006 WL 2735221, at *3 (D. Minn. Sept. 25, 2006). This case is readily distinguishable as specific acts of anticompetitive conduct (bid rigging) were alleged against St. Paul. No such obvious illegal conduct is alleged here and, therefore, the Complaint fails to plead the required connection between illicit activity and the allegedly inadequate disclosures. *See Menkes*, 2005 WL 3050970, at *7; *In re Marsh*, 2006 WL 2057914, at *41. It is also difficult to discern from the opinion in *St. Paul* precisely what "affirmative" statements regarding defendant's revenue growth were rendered misleading by the undisclosed anticompetitive activity, or what was the extent of the alleged anticompetitive activity. Not every allegation of an antitrust violation will render

22

### 3.    Claim 3: Duty to Break Out Contingent Commission Costs

While plaintiffs failed to address the issue in their motion papers, the Complaint alleges that AXIS's disclosure of its acquisition costs was misleading as it did not state that acquisition costs included the payment of contingent commissions. (May 16, 2006 Tr. 52–53.) According to plaintiffs' complaint, this "led investors to believe that acquisition costs were the costs of doing business rather than illicit incentive commission payments." (Compl. ¶¶ 91, 100, 114, 124, 133, 142.) This claim suffers from more than one pleading infirmity. Leaving aside the sufficiency of allegations that such payments were "illicit" (that is, anticompetitive), there are no factual allegations to support the assertion that contingent commissions based on the amount or profitability of business placed by brokers. To the contrary, the complaint taken as a whole makes perfectly clear that many insurance companies paid such commissions in order to secure business from the brokers. It seems inarguable then that the commissions were indeed a cost of business, a point apparently confirmed by the absence of any allegation that AXIS's financial statements were inaccurate. As to any claim that AXIS was nonetheless required to identify contingent commissions as a line item, plaintiffs point to no accounting or reporting requirements which would require the disaggregation of acquisition costs. It was for this reason that two courts have dismissed claims that brokers were required to report contingent commission revenues separately from the rest of their insurance service revenues. *In re Marsh*, 2006 WL 2057194, at *40–*41; *Iron Workers*, 432 F. Supp. 2d at 586. Absent identification of some duty to disclose and

---

misleading generalized statements regarding a company's increased earnings or the competitive state of the marketplace.

specific allegations as to how AXIS's existing disclosure was rendered false, plaintiffs' fail to state a claim upon which relief may be granted.

## C.    Section 10(b): Scienter

Where "the facts alleged in the Complaint are insufficient to support Plaintiffs' belief that false or misleading statements were made, those facts cannot support an inference that Defendants knew or should have known their statements were false or misleading when Defendants made them." *Feasby v. Industri-Matematik Int'l Corp.*, 99 Civ. 8761 (LTS), 2003 WL 22976327, at *5 (S.D.N.Y. Dec. 19, 2003) (failure to meet pleading standards of both 15 U.S.C. § 78u-4(b)(1) and (2)). However, even if the complaint adequately alleged material misstatements and omissions, plaintiffs' allegations of scienter would still be insufficient to state a claim under Section 10(b).

Rule 9(b) requires that all averments of fraud be "stated with particularity." Likewise, the PSLRA requires that plaintiffs "state with particularity [the] facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (2000). "The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b-5, that the plaintiff must allege is an intent to deceive, manipulate or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks and citations omitted). Scienter may be adequately pleaded, in compliance with Rule 9(b) and the PSLRA, by "(1) alleg[ing] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) alleg[ing] facts to show that defendants had both motive and opportunity to commit fraud." *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004); *see also Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (such a strong inference "may arise where the complaint sufficiently

24

alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor") (citations omitted). A pleading technique, however, "that couples a factual statement with a conclusory allegation of fraudulent intent is insufficient to support the inference that the defendants acted recklessly or with fraudulent intent." *Rombach*, 355 F.3d at 176.

1. Conscious Misbehavior or Recklessness

An inference of scienter may arise where the complaint sufficiently alleges that the defendants … engaged in deliberately illegal behavior [or] knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311. To adequately allege scienter under the "conscious misbehavior" standard, plaintiffs must show conduct by defendants that is "at the least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Initial Pub. Offering Secs. Litig.*, 358 F. Supp. 2d 189, 216, (S.D.N.Y. 2004). The inquiry is "highly fact-based." *Kalnit*, 264 F.3d at 142.

Plaintiffs point to three specific allegations that, they assert, support their theory of conscious misbehavior. First they assert that, because the AXIS Defendants and Marsh "were aware of and approved the contingent commission agreements,"[5] a strong inference has arisen that defendants "knew the truth about the Axis fraud." (Pls.' Opp'n Mem. 27). Second, they allege that the fact that AXIS announced it would cease these

---

[5] Another court has found a failure to plead a strong inference of scienter based upon insurance broker officers' and directors' mere knowledge that such agreements existed. *Iron Workers Local 16 Pension Fund*, 432 F. Supp. 2d at 592.

agreements following the New York AG investigation "gives rise to a strong inference that the [AXIS] defendants ... knew of the impropriety of the [agreements] and had deliberately chosen to conceal their existence during the Class Period." (Compl. ¶ 175). Third, they claim that the settlement of the New York AG's investigation paid $850 million and $190 million, respectively, and agreed to terminate the use of contingent commission agreements given rise "to a strong inference that the defendants knew that the [agreements] amounted to an improper if not illegal practice and had deliberately chosen to conceal their existence during the Class Period."[6] (*Id.* ¶ 176.)

As an initial matter, plaintiffs appear to conflate the long-standing use of contingent commission agreements with the misuse of such agreements alleged on the AG Complaint. The misuse of these agreements is alleged in some detail in the AG Complaint and includes the use of specific steering practices by Marsh employees, and obviously anticompetitive bid rigging by Marsh and certain insurance companies. (AG Compl. ¶¶ 43–66.) Plaintiffs utterly fail to make any similar particularized allegations against AXIS in the present case. Instead, plaintiffs content themselves with the syllogism that AXIS entered into contingent incentive agreements and, therefore, they have engaged in a "hidden" scheme. This conclusion is belied by their own complaint which acknowledges that these agreements have been in general use in the industry for a long time. Indeed, New York law expressly contemplates that a broker may be "compensated contingent upon [an] insurer's profits on . . . business" N.Y. Comp. Codes. R. & Regs. tit. 11, § 80-2.2(b)(4)(14) (2005), and, as noted, the New York Superintendent

---

[6] The Court notes the vagueness and lack of coherence of plaintiffs' allegations with respect to fraud perpetuated via these agreements—at points, plaintiffs describe the AXIS agreements themselves as "secret" and undisclosed (Compl. ¶ 112), while at others, they contend it was not the agreements themselves that were concealed from investors, but their "nature" (Pls.' Opp'n Mem. 47).

of Insurance has explicitly disclaimed the position that the agreements are themselves illegal (N.Y.S. Insurance Dep't Statement, Dnistrian Decl. Ex. 4). Moreover, Marsh's own SEC filings disclose the existence of contingent commission agreements and the method by which they are calculated. (*See, e.g.*, Compl. ¶ 119.) Whether Marsh's disclosures were inadequate in some other way is not at issue here. But surely this open use of incentive agreements in the insurance industry renders implausible any inference that AXIS or its managers knew that the agreements were illegal or, more to the point, knew that the disclosures that are the subject of the complaint were likely fraudulent. *See Marsh*, 2006 WL 2057914, at \*80–\*81 (knowledge of use of contingent commission agreements insufficient to establish scienter); *Iron Workers*, 432 F. Supp. 2d at 592–93 (same).

Given the acknowledged use of contingent arrangements, the fact that AXIS voluntarily abandoned their use in the wake of controversy is insufficient to raise the requisite strong inference of scienter. Indeed it is equally if not more plausible to infer that AXIS was acting in its own economic self interest in terminating agreements that had increased its cost of doing business. Nor do the statements of AXIS's officers at the time the company discontinued use of the agreements reflect any admission of illegal conduct as plaintiffs allege.[7]

---

[7] For example, plaintiffs cite to defendant Charman's letter to shareholders that was included in the Company's 2004 Annual Shareholder Report to support its allegation that AXIS has "condemned the [incentive commission] practice and publicly acknowledged that it should have been disclosed to investors." (Compl. ¶ 11.) They quote Charman's statement in that letter that "we have been dismayed by the findings of this industry-wide investigation and do not in anyway condone this type of alleged behavior" and assert that such a statement "gives rise to a strong inference of the defendants' scienter." It is clear, however, that Charman is referring not to the existence of incentive commission arrangements with this statement, but to the bid rigging, fictitious quoting, and reinsurance-tying aspects of the Attorney General's investigation.

27

Finally, the fact that two brokers, Marsh and Aon, settled complaints in which they were alleged to have misused incentive arrangements and engaged in hard-core antitrust violations, cannot raise an inference that AXIS had knowledge that its use of such agreements violated the antitrust laws (in some as yet unspecified way) or that this information was intentionally concealed from its shareholders. *See In re Bristol-Myers Squibb Secs. Litig.*, 312 F. Supp. 2d 549, 567–68 (S.D.N.Y. 2004) (finding allegation of scienter inadequate absent an allegation "that the accounting treatment adopted by [the corporation] was the subject of prior accounting rules or literature" because no "strong inference [could] be drawn that Defendants knew or were reckless in not knowing that the accounting for the sales at issue was wrong and, therefore, that the financials recognizing revenue on those sales were wrong"); *Funke v. Life Fin. Corp.*, 237 F. Supp. 2d 458, 468–69 (S.D.N.Y. 2002) (where the accounting rule allegedly violated was ambiguous and there were no SEC clarifications until after the alleged misstatements, circumstances were held to be "entirely antithetical to the notion that defendants engaged in conscious misconduct or reckless behavior"); *In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) (plaintiffs failed to show scienter on a theory of conscious misbehavior where they "failed to plead with requisite particularity that any of the defendants engaged in illegal behavior" in case where they conclusorily asserted that an opportunity to invest in a lucrative partnership "constituted a 'kickback' for [defendant] officers to participate in the Enron fraud"); *see also Kalnit*, 264 F.3d at 144 (where complaint does not present facts indicating a clear duty to disclose, plaintiffs' scienter allegations do not provide strong evidence of conscious misbehavior or recklessness).

28

## 2. Motive and Opportunity to Commit Fraud

Having failed to allege facts constituting strong circumstantial evidence of conscious misbehavior or recklessness, plaintiffs may still establish scienter by alleging facts to show defendants had both motive and opportunity to commit fraud. *See Kalnit*, 264 F.3d at 138. With respect to the AXIS Defendants at least, it is undisputed that they would have the opportunity to commit the alleged fraud; "no one doubts that the defendants had the opportunity, if they wished, to manipulate the price of the company's stock." *In re Time Warner Inc.*, 9 F.3d at 269. Thus, the "key question" becomes defendants' motive, which must be pleaded with greater specificity than opportunity. That is, plaintiffs must "adequately allege[] concrete [and particularized] benefits that could be realized by one or more of the false statements and wrongful disclosures alleged." *Rothman*, 220 F.3d at 93. Plaintiffs argue that motive is established with respect to the AXIS Defendants because (1) the Individual Defendants received, in aggregate, $4.2 million in performance-based bonuses in 2003, and (2) AXIS participated in the 2004 Secondary Offering that raised, in total, $640 million. They argue that motive is established with respect to Marsh because of the "unusual and suspicious sales of stock at artificially inflated prices by [its] wholly owned affiliates." (Pls.' Opp'n Mem. 28.) None of plaintiffs' arguments however, adequately establish defendants' motive for purposes of pleading scienter.

### a. *AXIS's Alleged Motive*

With respect to the $4.2 million in performance-based bonuses that Charman, Butt, and Cook collectively received in 2003 (Compl. ¶¶ 33, 40, 45), the law is clear that the desire of individual defendants "to keep their jobs or increase their compensation by artificially inflating . . . stock price" is not sufficient to establish motive. *Davidoff v.*

*Farina*, 04 Civ. 7617 (NRB), 2005 WL 2030501, at *17 n.30 (S.D.N.Y. Aug. 22, 2005);
*see also Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d. Cir. 1995) ("Plaintiffs'
allegation that defendants were motivated to defraud the public because an inflated stock
price would increase their compensation is without merit . . . . Incentive compensation
can hardly be the basis on which an allegation of fraud is predicated."). Motives which
may be easily imputed to "any publicly-owned, for-profit endeavor [are] not sufficiently
concrete for purposes of inferring scienter," *Kalnit*, 264 F.3d at 140 (internal quotation
marks and citation omitted), and "generalized allegations of intent to maintain lucrative
business relationships and to establish new ones do not set forth a motive for scienter
purposes," *In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y.
2005).

        In support of the proposition that bonus compensation is nevertheless sufficient to
establish motive, plaintiffs cite *In re Wellcare Management Group, Inc. Securities
Litigation*, 964 F. Supp. 632 (N.D.N.Y. 1997). However, the court in *Wellcare* was
careful to distinguish the facts as pled there from the general rule that, without more, such
a basis is inadequate to establish motive. In *Wellcare*, the court noted that it could not
"sustain the plaintiffs' claims on the basis of motive if scienter rests solely on the fact that
individual defendants stood to benefit by way of employment incentives," but
nevertheless found motive sufficiently alleged because of other evidence of fraudulent
intent. *Id.* at 639; *see also In re Donna Karan Int'l Secs. Litig.*, 97 Civ. 2011 (CBA),
1998 WL 637547, at *19 (E.D.N.Y. Aug. 14, 1998) ("The *Wellcare* court did not go on
to specify what that other evidence before the court was, but instead stated that because
defendants allegedly profited from the fraud, plaintiffs had satisfied their pleading burden
. . . . To the extent that the *Wellcare* decision can be understood to find a motive to

                                              30

commit fraud based solely upon the existence of incentive compensation, it appears inconsistent with the Second Circuit's decision in *Acito*.").

With respect to AXIS's participation in the 2004 Secondary Offering, plaintiffs' allegations are plainly insufficient to establish motive because the AXIS Defendants did not stand to gain any proceeds in the offering. (*See* AXIS Capital Holdings Limited Secondary Offering Prospectus, Apr. 15, 2004, Holton Decl. Ex. C. at 7, 117–18.) In *In re Complete Management Inc. Securities Litigation*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001), upon which plaintiffs' partially rely, the court noted that "a generalized desire to maintain a higher stock price will not rise to the level of motive" but found that the "artificial inflation of a stock price in order to achieve some *more specific* goal may satisfy the pleading requirement." In that case, the plaintiffs identified such a specific goal, in the form of alleging "unusual insider trading activity" on the part of defendants, and that "defendants sought to maintain the artificially high stock price so that [the corporate entity] might use that stock as currency for acquisitions that would leverage what the defendants knew were ultimately uncollectible receivables." *Id.* In *In re Twinlab Corp. Securities Litigation*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000), also relied upon by plaintiffs, the court found that the desire to inflate the stock price to maximize revenue from a secondary offering" was, among other allegations, sufficient to allege motive at the pleading stage. There, however, the issuer-defendant was seeking to "maximize revenue" in a secondary offering in which roughly half the 9.2 million shares sold were sold *by* the issuer itself. *Id.* at 197, 206. The court went on to specifically distinguish the case from one where the alleged motive to facilitate acquisitions by using the inflated value of its stock as merger consideration were found to be *insufficient* to establish motive because such alleged "motivations were not clearly in the individual

31

defendants' economic self-interest." *Id.* at 206–07 (emphasis added) (discussing *In re Health Mgmt.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1997)).

This case is similarly distinguishable from *Twinlab* and *Wellcare*, because plaintiffs have not alleged the requisite "specific goal" or relevant economic self-interest. *Cf. Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105, 114 (D. Conn. 2005) ("Stock ownership establishes motive only if defendants are also alleged to have benefited from an inflated stock price in a particular manner, for example, by selling a large number of shares shortly after the alleged fraud . . . . Absent any allegations that [a defendant] benefited from the inflated stock price immediately in a more direct and less common manner, this allegation is insufficient to establish motive.").

### b. *Marsh's Alleged Motive*

Plaintiffs assert that their allegations of motive and opportunity are sufficient to establish scienter with respect to defendant Marsh because its wholly owned affiliates sold 3,555,100 shares in the Secondary Offering, for a return of approximately $95.9 million (Compl. ¶ 74), while in possession of undisclosed adverse information. It is generally true that scienter may be established by showing insider trading, however, "[t]he mere allegation of insider sales during the Class Period does not, without more, properly allege motive. Instead, Plaintiffs must further allege adequately that the insider sales were 'unusual.'" *In re LaBranche Secs. Litig.*, 405 F. Supp. 2d 333, 354 (S.D.N.Y. 2005). "Factors considered in determining whether insider trading activity is unusual include [1] the amount of profit from the sales, [2] the portion of stockholdings sold, [3] the change in volume of insider sales, and [4] the number of insiders selling." *In re Scholastic Corp. Secs. Litig.*, 252 F.3d 63, 74–74 (2d Cir. 2001) (citing *Rothman*, 220 F.3d at 94).

32

Plaintiffs have not made allegations with respect to the pattern of the Marsh's sales of AXIS stock prior to the Secondary Offering; nor does the record reflect the profit realized by Marsh in the Secondary Offering. Therefore the Court will not consider these factors in determining whether the sales qualify as "unusual." The 3,555,100 shares sold by Marsh in the offering represented only eight percent of Marsh's beneficial ownership of AXIS stock (Compl. ¶¶ 74, 76), and "courts of this district have held that 'insider sales that represent less than ten percent of that insider's total holdings are insufficiently 'unusual' to permit an inference of scienter.'" *In re LaBranche Secs. Litig.*, 405 F. Supp. 2d at 356 (quoting *In re Initial Public Offering*, 241 F. Supp. 2d at 367–68); *see also Rothman*, 220 F.3d 81 at 95 ("[T]he inference of scienter is weakened" where sales are "only a small fraction of [the seller's] shares in the corporation."); *Acito*, 47 F.3d at 54 (stock sales that amounted to less than eleven percent of holdings failed to qualify as unusual); *In re Keyspan*, 383 F. Supp. 2d at 384–85 (sales of less than twenty percent of holdings insufficient to establish scienter).

Moreover, the timing of the Secondary Offering—six months in advance of the filing of the AG Complaint—does not suggest a motive to commit fraud. "The timing of a transaction is unusual or suspicious when its timing is calculated to maximize personal benefit from inside information." *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1999). Timing is more typically an indicia of fraud where sales occur shortly after insiders allegedly learn undisclosed adverse information or made affirmative misrepresentations, *see, e.g., Stevelman*, 174 F.3d 79; *Ressler*, 75 F. Supp. 2d at 60 ("[T]he Court concludes that the stock sales at issue, being remote in time from any misstatements and in amounts that do not necessarily support a claim of fraud, were not unusual or suspicious and therefore do not demonstrate that defendants had a motive to

commit fraud."), or shortly before corrective disclosures are made in the market, *see, e.g.*, *In re Oxford Health Plans, Inc., Secs. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("In late August 1997, two months before the devastating October 27, 1997 press release and in the midst of a NYSID investigation that was eventually going to reveal Oxford's accounting irregularitics and internal control deficiencies, all of the Individual Defendants except Sullivan sold shares of Oxford common stock for aggregate profits of approximately \$33,000,000. The timing of these trades is 'suspicious' enough, along with the other evidence, to support a strong inference of scienter."); *In re Keyspan*, 383 F. Supp. 2d at 385 (finding that two-month gap between sales and public statement disclosing problems was not "strongly suspicious in light of othcr factors weighing against an inference of fraud"); *Ressler*, 75 F. Supp. 2d at 60 (timing of stock sales six months before release of negative information "does not suggest that defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price"). Here, the timing of the Secondary Offering raises no inference of fraud. Neither Marsh nor AXIS could have predicted the filing of the AG Complaint—indeed, where in time the Secondary Offering occurred in relation to that filing was purely a matter of chance. There is no "suspicious" or "unusual" relationship between the timing of the Secondary Offering and any allegedly false statements or negative revelations. In short, the timing of the Secondary Offering was at best fortuitous, and simply does not appear "calculated to maximize personal benefit from insider information." *Ressler*, 75 F. Supp. 2d at 60 (quoting *In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989)).

Plaintiffs thus fail to make a showing that either the AXIS Defendants or Marsh had a motive, based on a concrete benefit that would accrue to them as a result of the alleged fraud, sufficient to establish scienter here.

**D. Section 20 liability**

Because plaintiffs have not sufficiently alleged primary liability here under
Section 10(b), plaintiffs have not alleged control person liability under Section 20 of the
Exchange Act, 15 U.S.C. § 78(t)(a) (2000). *See, e.g.*, *In re Corning Secs. Litig.*, 01 Civ.
6580 (CJS), 2004 WL 1056063, at \*32 (W.D.N.Y. Apr. 9, 2004); *In re Hudson Techs.
Secs. Litig.*, 98 Civ. 1616 (JGK), 1999 WL 767418, at \*13 (S.D.N.Y. Sept. 28, 1999).

**E. Section 11 and Section 12(a)(2)**

Section 11 of the Securities Act of 1933 provides that issuers and signatories,
including officers of the issuer and underwriters, may be liable for a registration
statement that "contained an untrue statement of a material fact or omitted to state a
material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. §
77k. Section 12(a)(2) imposes liability on any person who "offers or sells" a security by
means of a prospectus that "includes an untrue statement of a material fact or omits to
state a material fact necessary in order to make the statements, in light of the
circumstances under which they were made, not misleading." 15 U.S.C. §77l(a)(2).
Plaintiffs bring their Section 11 claim against AXIS, the Individual Defendants and the
Underwriter Defendants for the allegedly false and misleading statements contained in
the Registration Statement used in the Secondary Offering in the spring of 2004. They
bring their Section 12(a)(2) claim against Marsh and the Underwriter Defendants for the
same alleged misstatements and omissions contained in the Prospectus issued in
connection with that Offering. As discussed in greater detail above, plaintiffs have failed
to allege with sufficient particularity either an underlying anticompetitive scheme to drive
other insurers from the market, or the existence of material misstatements or omissions

relating to such an alleged scheme. On this basis both the Section 11 and Section 12(a)(2) claims must be dismissed.

Furthermore, while fraud is not a necessary element of either a Section 11 or Section 12(a)(2) claim, the Second Circuit has held that the heightened pleading standard of Rule 9(b) applies to these claims insofar as the claims are premised on allegations of fraud. *Rombach*, 355 F.3d at 171. Because "claims under Section 11 or Section 12(a)(2) may be—and often are—predicated on fraud," when the "same course of conduct that would support a Rule 10b-5 claim" is offered in support of a Section 11 or Section 12(a)(2) claim such claims are subject to the test of Rule 9(b). *Id.* None of the allegations underlying plaintiffs' Section 10(b)(5) claim implicate the Underwriter Defendants, nor are they named as defendants with respect to that claim. As such, the Section 11 and Section 12(a)(2) claims alleged against them cannot be, and are not predicated upon the same course of conduct underlying plaintiffs' claims of fraud. Plaintiffs' allegations against the Underwriter Defendants sound only in negligence,[8] and are therefore not subject to the heightened pleading requirements of Rule 9(b). *See id.* at 178.

However, since the Complaint is rife with allegations of fraud against AXIS, the Individual Defendants, and Marsh, whether plaintiffs' Section 11 and Section 12(a)(2) claims against them sound in fraud requires a separate analysis. As noted above,

---

[8] "None of the [Underwriter Defendants] made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects." (Compl. ¶ 232 (Section 11 Claim).) "The [Underwriter Defendants] were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the [Underwriter Defendants] made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate or complete in all material respects." (*Id.* ¶ 244 (Section 12(a)(2) Claim).)

36

plaintiffs allege that the Registration Statement and Prospectus contained materially false and misleading information for three interrelated reasons that may be summarized as follows: (1) omission of existence of illicit agreements was material, because in the absence of them the business would be unsustainable; (2) statements regarding competitiveness were rendered misleading by failure to disclose existence of competition-stifling illicit agreements and (3) statements regarding acquisition costs were rendered misleading by failure to accurately explain how that contingent commissions were included in reported acquisition costs. Plaintiffs do not allege that the Registration Statement or Prospectus contains any additional "untrue statement [or omission] of a material fact," independent of these allegations. Because the sole allegations supporting the falsity element of the Section 11 and Section 12(a)(2) claims are all inextricably intertwined with the allegations underlying plaintiffs' fraud claims against AXIS, the Individual Defendants, and Marsh, these claims undisputedly sound in fraud.[9] *See In re Atlas Air Worldwide Holdings Inc. Secs. Litig.*, 324 F. Supp. 2d 474, 503 (S.D.N.Y. 2004) ("The application of Rule 9(b) to § 11 claims is logical when the plaintiffs employ this pleading device because the only allegations supporting falsity are the plaintiffs' allegations relating to fraudulent intent. When this is the case, the plaintiffs' claims for fraud are substantially intertwined with their § 11 claims."). Plaintiffs' assertion that these claims are "not based on and do[] not sound in fraud" (Compl. ¶¶ 229, 237) does not alter this conclusion. Courts have repeatedly noted that the insertion of a simple

---

[9] Plaintiffs rely on only one case to support their contention that their Section 11 claim does not sound in fraud, *In re Initial Public Offering Securities Litigation*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003). (Pls.' Opp'n Mem. 51–52.) This decision, however, predates the Second Circuit's decision in *Rombach*, which expressly resolved a split within this Circuit as to whether Rule 9(b) may ever be applieable to Section 11 claims. 355 F.3d 164, 171 n.6 (listing those pre-*Rombach* district court cases that apply Rule 9(b) to Section 11 and Section 12(a)(2) claims "sounding in fraud" and those that did not).

disclaimer of fraud is insufficient. *See, e.g., In re Marsh*, 2006 WL 2057194, at \*34 ("In requiring heightened pleading for Section 11 claims sounding in fraud, *Rombach* emphasized the reputational interests Rule 9(b) seeks to protect . . . . Allowing plaintiffs to allege fraud over nine-hundred paragraphs and then withdraw those claims for eight paragraphs in order to state a Section 11 claim eviscerates Rule 9(b)'s mandate to "safeguard a defendant's reputation from improvident charges of wrongdoing."); *In re Alstom S.A. Secs. Litig.*, 406 F. Supp. 2d 402, 410 (S.D.N.Y. 2005) ("Although Plaintiffs affirmatively state in the Complaint that their Securities Act claims do not sound in fraud, despite that disclaimer—conclusory, self-proclaimed and self-serving though it necessarily is—on a more objective reading it is clear that the claims are premised on factual allegations permeated with accusations of fraudulent conduct on the part of the defendants. . . . Having made these broad averments portraying a pervasive and overarching scheme of fraud, one that apparently imbues all of the their specific causes of action and attendant claims of losses, Plaintiffs then attempt to retreat, apparently to escape the particularity requirement of Federal Rule of Civil Procedure 9(b). . . . However, Plaintiffs cannot so facilely put the fraud genie back in the bottle."); *Cal. Pub. Employees' Ret. Sys v. Chubb Corp.*, 394 F.3d 126, 160 (3d Cir. 2004) (where a review of the section 11 claims "establishes that the claims are indisputably immersed in unparticularized allegations of fraud, . . . [a] one-sentence disavowment of fraud contained within Plaintiffs section 11 Count … does not require us to infer that the claims are strict liability or negligence claims, and in this case is insufficient to divorce the claims from their fraudulent underpinnings"). As discussed at length above, plaintiffs fail to plead fraud with particularity, as required by Rule 9(b) and the PSLRA, providing an

additional ground for dismissing the Section 11 and Section 12(a)(2) claims alleged against AXIS, the Individual Defendants, and Marsh.

**F.     Section 15**

Plaintiffs' Section 15 claims will fail here as well. To state a claim for controlling person liability, plaintiffs must adequately allege: "(1) an underlying primary violation; and (2) the individual defendant had control over the primary violator." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002). As discussed above, plaintiffs have failed to allege a primary violation under Section 11 or Section 12. Accordingly, plaintiffs' Section 15 claims are dismissed.

**CONCLUSION**

It is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiffs leave to file an amended complaint. *Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003). "[A] court granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Id.* (internal quotation marks omitted). In particular, regarding claims of fraud, "[p]laintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint." *Olsen v. Pratt & Whitney Aircraft Div. of United Techs. Corp.*, 136 F.3d 273, 276 (2d Cir. 1998) (citing *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)). While the Court is uncertain that plaintiffs can readily cure the deficiencies in their Complaint, plaintiffs are granted leave to attempt to do so.

For the foregoing reasons, plaintiffs' consolidated complaint [18] is dismissed without prejudice. Plaintiffs have thirty (30) days from the date of this Memorandum

Opinion and Order to file a second amended consolidated complaint consistent with this

opinion.

SO ORDERED.

Dated: New York, New York
October 17, 2006

Richard J. Holwell
United States District Judge

40